ANDREW M. CALAMARI
Associate Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
Room 400
New York, New York  10281-1022
(212) 336-1023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————
SECURITIES AND EXCHANGE COMMISSION,      :
                                         :
                        Plaintiff,       :
                                         :          08 Civ. ____  ( ____ )
            v.                           :
                                         :          COMPLAINT
ANTHONY J. CUTI and                      :
WILLIAM J. TENNANT,                      :          ECF CASE
                                         :
                        Defendants.      :
———————————————————————

Plaintiff Securities and Exchange Commission, for its complaint against Defendants Anthony J.

Cuti and William J. Tennant, alleges as follows:

## PRELIMINARY STATEMENT

1.      This action arises out of a financial reporting fraud at Duane Reade Holdings,

Inc., and its predecessor Duane Reade Inc., operator of the largest chain of drug stores in the

New York metropolitan area.  From 2000 to 2004, Duane Reade boosted its reported income

through a series of fraudulent transactions designed by Defendant Anthony J. Cuti, Duane

Reade's former CEO, and primarily implemented by Defendant William J. Tennant, Duane

Reade's former Real Estate Administrator and one-time CFO.  Most of the fraudulent

transactions involved sham, round-trip payments that brought no value to Duane Reade; all of

them were engineered to improperly boost current period income and were supported by false and/or misleading documentation designed to fool the company's independent auditors. Whatever their form, the transactions' artificial effect on income allowed Duane Reade to report favorable earnings to public investors and to meet analysts' expectations.

2.     The earnings inflation scheme involved two kinds of transactions: The "Real Estate Concession" transactions and the "Credit and Rebilling" transactions. The Real Estate Concession transactions involved payments to Duane Reade for its agreement to relinquish purportedly valuable, below-market leases or other real estate rights and options. All but one of them were actually sham, round-trip transactions that resulted in no recognizable value to Duane Reade at all; in most of those round-trip transactions, Cuti persuaded the counter-parties to make payments to Duane Reade in exchange for his promise to repay them through fictitious invoices for services they never rendered. On the basis of false documentation prepared in most cases by Tennant at Cuti's direction, and Cuti's and Tennant's false representations to Duane Reade executives and auditors, Duane Reade improperly recorded the payments made by the counter-parties as current income, and amortized the repayments. As a result, Cuti and Tennant manufactured an immediate boost to income, and, by amortizing the later payback transactions, avoided any substantial offsetting expense.

3.     In the Credit and Rebilling scheme, Cuti engineered different round-trip transactions that he designed to produce additional current income, with no off-setting current expenses on repayment. Beginning in 2000 and continuing into 2004, Cuti had Duane Reade construction and maintenance vendors issue credits to the company that were booked as a reduction to current expenses, resulting in a corresponding increase to current income. At Cuti's direction, the vendors were explicitly told, however, that they would be paid by Duane Reade for

the credited amounts in later periods pursuant to fictitious invoices. Duane Reade later paid the vendor invoices for phantom services that they had never performed, and the previous credits were thereby reversed. To disguise the connection between the invoice payments and the original credits, and to ensure that the reimbursements could be capitalized and amortized, rather than charged against current income as a current expense, Cuti had the vendors submit the fictitious invoices for work performed on a construction or maintenance project different from that on which the vendor had issued the credits.

4.      On June 29, 2007, Duane Reade Holdings, Inc., Duane Reade, Inc.'s successor, restated its previously reported financial results for the fiscal years 2000 through 2004 to correct for the overstatement of income attributable to the fraud. Based on the Restatement, the fraud caused Duane Reade to overstate its pre-tax income by a total of approximately $17.5 million, and by $1.9 million, or 5%, for the 2000 fiscal year; $5.2 million, or 14%, for the 2001 fiscal year; $5.6 million, or 13%, for the 2002 fiscal year; $1 million, or 16%, for the 2003 fiscal year; $0.3 million, or 7%, for the seven months ended July 30, 2004; and $3.5 million, or 4%, for the five months ended December 25, 2004.

5.      The inflated results produced by the Real Estate Concession and Credit and Rebilling schemes were reflected in various filings made pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78m(a) and 78o(d), in a June 30, 2004 proxy statement, and in several registration statements the company filed in 2004 and 2005.

6.      Cuti conceived of and oversaw both schemes. As the company's CEO, he also reviewed and signed Duane Reade's public filings that overstated materially the company's earnings and income. Tennant reviewed and signed the company's 2000 Form 10-K, which he

knew, or was reckless in not knowing, materially overstated earnings and income.  In addition, as the company's Real Estate Administrator, Tennant implemented the Real Estate Concession transactions with knowledge or reckless disregard of their fraudulent purpose, by either structuring the transactions, and/or drafting and signing many of the agreements purportedly reflecting them.  To assure the success of the Real Estate Concession scheme in inflating reported income, Cuti and Tennant made false representations and omitted material facts in conversations with the company's CFO and other members of management.  Cuti also made false statements and omitted material facts in conversations with, and written representations to, the company's independent auditors.

7.      Through this conduct and that detailed below, Cuti and Tennant violated the antifraud provisions of the federal securities laws, falsified books and records, and caused Duane Reade to file with the Commission inaccurate reports of its financial results.  Specifically, both Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and violated or aided and abetted violations of Sections 10(b) and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78m(b)(5), and Rules 10b-5, 13b2-1, and 13b2-2, 17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2, and aided and abetted violations of Sections 13(a), 13(b)(2)(A), and 15(d) of the Exchange Act, 15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78o(d), and Rules 12b-20, 13a-1, 13a-11, 13a-13, 15d-1, 15d-11, and 15d-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, 240.15d-1, 240.15d-11, and 240.15d-13.  In addition, Cuti violated Rules 13a-14 and 15d-14 of the Exchange Act, 17 C.F.R. §§ 240.13a-14 and 240.15d-14, and aided and abetted Duane Reade's violations of Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B).

8.     The Commission seeks an order enjoining Cuti and Tennant from future violations of the securities laws, requiring them to disgorge ill-gotten gains with prejudgment interest and to pay civil monetary penalties, and barring each of them from serving as an officer or director of a public company.

## JURISDICTION AND VENUE

9.     The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a), and Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa. The Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged in this Complaint.

10.     This Court has subject matter jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Defendants, directly and indirectly, made use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint. Certain of these transactions, acts, practices, and courses of business occurred in the Southern District of New York, including, among other things, portions of the negotiations concerning the fraudulent transactions described herein.

## THE DEFENDANTS

11.     **Anthony J. Cuti**, age 63, was Chairman, Chief Executive Officer and President of Duane Reade from April 1996 until November 21, 2005, when he was fired. Cuti is a

certified public accountant licensed in the State of New York although his license has lapsed. Cuti resides in Saddle River, New Jersey.

12.     **William J. Tennant**, age 61, was an officer of Duane Reade from 1997 until September 2001.  From 1997 until August 1999, Tennant served as the company's Chief Financial Officer, and from August 1999 until September 2001, he was its Vice President for Planning and Logistics.  From September 2001 until November 2005, Tennant worked for the company on a consulting basis, and was the company's Real Estate Administrator, responsible for oversight and implementation of all of Duane Reade's real estate transactions.  Tennant is a certified public accountant licensed in the State of Illinois, but his license has lapsed.  Before he joined Duane Reade, Tennant held senior financial positions at other public companies and he was at one time an auditor at a major public accounting firm.  Tennant resides in Richmond, Virginia.

## OTHER RELEVANT ENTITY

13.     **Duane Reade** operates the largest chain of drug stores in the metropolitan New York area and has its principal place of business in New York, New York.  The company, then known as Duane Reade, Inc., was publicly held from February 1998 until July 30, 2004, when it was acquired by a private equity firm, Oak Hill Capital Partners, L.P., and renamed Duane Reade Holdings, Inc.  The acquisition was achieved through a purchase of all the outstanding shares of Duane Reade's common stock, combined with a public offering of debt securities.  As a result of the acquisition, Duane Reade ceased to have equity securities registered pursuant to the Exchange Act; Duane Reade Holdings, Inc. continued to make filings with the Commission pursuant to Section 15(d) of the Exchange Act.  Duane Reade, Inc. and Duane Reade Holdings, Inc. are collectively referred to herein as "Duane Reade."

## FACTS

14.     Cuti became Duane Reade's Chairman, CEO and President in 1996, when it was a private company. Under his direction, the company expanded rapidly, growing from sixty stores when he took over to 172 stores by 2000, and 255 stores by 2004. Cuti directly oversaw Duane Reade's expansion, and, throughout the relevant period, made all important decisions concerning real estate. He was also instrumental in first bringing Duane Reade public in February 1998, and then taking it private in July 2004. Cuti used Duane Reade's rapid expansion – specifically the store openings, closings and build-outs – to perpetrate the Real Estate Concession scheme and the Credit and Rebilling scheme.

15.     Tennant served as Duane Reade's CFO from 1997 until August 1999, when he became the company's Vice President for Planning and Logistics. From that point on, his primary responsibility was to assist Cuti in coordinating Duane Reade's store expansion, and monetizing its lease holdings. In 2001, he retired from Duane Reade, but until November 2005, as a consultant, he acted as Duane Reade's Real Estate Administrator with responsibility for the management and oversight of all aspects of Duane Reade's real estate interests and transactions. As described below, Tennant knowingly executed Cuti's Real Estate Concession scheme by structuring and/or documenting the transactions to achieve their fraudulent purpose.

16.     As a result of the Real Estate Concession scheme and the Credit and Rebilling scheme, Duane Reade overstated pre-tax income by 4 to 16% in the 2000 through 2004 fiscal years. The impact of the fraud is summarized in Table 1, below.

**Table 1**
**Impact of Fraud on Selected Results**
**For the 2000 through 2004 Fiscal Years**[1]

| (in thousands) | FY 2000 | FY 2001 | FY 2002 | FY 2003 | (P) 2004 | (S) 2004 |
|---|---|---|---|---|---|---|
| Reported income (loss) from continuing operations before taxes | $38,286 | $43,453 | $50,337 | $7,255 | $5,361 | ($88,007) |
| Restatement | | | | | | |
| -Real Estate Concession | $1,570 | $3,959 | $2,862 | $754 | $675 | $3,412 |
| -Credit & rebilling | $301 | $1,285 | $2,737 | $238 | ($323) | $60 |
| Total | $1,871 | $5,244 | $5,599 | $992 | $352 | $3,472 |
| restated income (loss) from continuing operations before taxes | $36,415 | $38,209 | $44,738 | $6,263 | $5,009 | ($91,479) |
| Overstatement % | 5% | 14% | 13% | 16% | 7% | 4% |

17.     The Real Estate Concession and Credit and Rebilling schemes – and the improper accounting for them – also enabled the company to meet or exceed analysts' expectations in several periods. Once Cuti initiated the two schemes in the fourth quarter of 2000, Duane Reade proceeded to meet or exceed Wall Street expectations in all but one of the following ten quarters. As shown in Table 2, without the income attributable to these schemes, the company could not have done so.

---

[1]     The company's fiscal year is the 52- or 53-week reporting period ending on the last Saturday in December. As a result of the going private transaction, the company issued separate financial statements for the seven months ended July 30, 2004 (the "predecessor period," or "P"), and the five months ended December 25, 2004 (the "successor period," or "S"), which were separately restated. The Restatement was contained in the Form 10-K for the 2006 fiscal year, which was filed on June 29, 2007.

**Table 2**
**Impact of Improper Accounting on Duane Reade's**
**Earnings per Share[2] Versus Analysts' Expectations**

| Fiscal Quarter | Reported EPS | Analysts' Projected EPS | Restated EPS | Restated EPS vs. Analysts' Projected EPS |
|---|---|---|---|---|
| Q4 2000 | $0.51 | $0.51 | $0.45 | $(0.06) |
| Q1 2001 | $0.14 | $0.13 | $0.14 | $0.01 |
| Q2 2001 | $0.36 | $0.35 | $0.30 | $(0.05) |
| Q3 2001 | $0.27 | $0.27 | $0.25 | $(0.02) |
| Q4 2001 | $0.42 | $0.42 | $0.36 | $(0.06) |
| Q1 2002 | $0.22 | $0.21 | $0.21 | - |
| Q2 2002 | $0.41 | $0.41 | $0.40 | $(0.01) |
| Q3 2002 | $0.33 | $0.32 | $0.25 | $(0.07) |
| Q4 2002 | $0.39 | $0.36 | $0.34 | $(0.02) |
| Q1 2003 | $0.13 | $0.15 | $0.09 | $(0.06) |

A.    **The Real Estate Concession Scheme**

18.    Historically, Duane Reade had generated income from its early termination of

lease agreements with landlords.  Duane Reade controlled a number of long-term leases at a time

when New York City commercial rental rates were increasing dramatically.  Duane Reade's rent

at these locations was significantly below market rates, and the landlords were therefore typically

willing to pay Duane Reade to terminate the leases early, so that the landlord could rent the space

to a new tenant at a higher rent.  If structured to satisfy applicable Generally Accepted

---

[2]    "Reported EPS" represents diluted EPS adjusted for one-time and/or unusual items;
"Analysts' Projected EPS" represents last analysts' consensus EPS prior to earnings
release; and "Restated EPS" represents EPS based on the company's restated results.

Accounting Principles ("GAAP"), such concession payments may be accounted for by the lessee as income in the period in which the payment is received or accrued.[3]

19.     This action arises out of other transactions that Cuti and Tennant disguised as legitimate real estate concession transactions, but which were not bona fide or at arms length. Beginning in 2000, Cuti orchestrated, and Tennant structured and/or documented, more than fourteen fraudulent transactions designed so that Duane Reade could immediately recognize the income they purported to produce. Because each of these transactions either involved sham, round-trip payments, or was falsely documented to justify recognizing the entire payment received as current income, each of them was fraudulent.

20.     The Real Estate Concession scheme was initiated and engineered by Cuti. It was primarily implemented, however, by Tennant who knew, or was reckless in not knowing, that the transactions involved lacked economic substance and were improperly booked as producing current income to Duane Reade. As Duane Reade's Real Estate Administrator, and with knowledge of the scheme and its purpose, Tennant structured the Real Estate Concession transactions, drafted the agreements documenting them, and/or signed those agreements on behalf of the company. He also made false representations to Duane Reade's CFO about the transactions, which, as a former CFO and public auditor, he knew, or was reckless in not knowing, the CFO would pass on to the company's independent auditors.

21.     In total, Duane Reade overstated its pre-tax income by $13.2 million as a result of the Real Estate Concession scheme. What follows is a description of several of the Real Estate Concession scheme's round-trip transactions with Duane Reade's primary real estate broker.

---

[3]     GAAP also provides that certain payments made by lessees for brokerage services attendant to leases may be amortized over the life of the lease, allowing a lessee to spread the costs of obtaining the lease over its term rather than reflecting the expenses in the period they are incurred or paid.

The other transactions making up the Real Estate Concession scheme, including transactions with different counter-parties, are reflected in Appendix A

22.     Duane Reade primarily relied on a single real estate brokerage firm (the "Broker") to negotiate its leases. Working with Tennant, the Broker was effectively Duane Reade's real estate department. In that capacity, the Broker performed most of Duane Reade's real estate-related administrative functions, including maintaining and updating a list of Duane Reade's real estate holdings, and its rights and obligations with respect to those holdings, and negotiating with landlords for about ninety-five percent of Duane Reade's real estate transactions. The Broker was similarly dependent on Duane Reade; income from its Duane Reade work accounted for most of the Broker's income.

23.     As Duane Reade's effective real estate department, the principals of the Broker (the "Principals") were included in most of the real estate-related decision-making at the company. At Cuti's invitation, the Principals attended a weekly meeting with Duane Reade management, including Tennant, to discuss Duane Reade's real estate holdings, expiring leases, planned store openings and related issues. On numerous occasions, after the regular weekly real estate meeting was adjourned and Cuti had dismissed the other participants, he held a second meeting with Tennant and the Principals. At the second meeting, Cuti typically discussed the Real Estate Concession transactions – known to the Principals as "the Cuti deals."

24.     Cuti initiated Duane Reade's Real Estate Concession transactions with the Broker's Principals in 2000, immediately after a quarter in which Duane Reade missed analysts' earnings projections by $0.02. When Cuti first approached the Principals and told them that he wanted them to pay Duane Reade for an option to purchase certain real estate rights, the Principals objected, and told Cuti that the option he was offering had no value. Cuti told the

Principals that if they did not do the deal and pay Duane Reade, he would find another broker who would. But Cuti also committed to repay the Principals through separate transactions, and promised that they would break even on the Real Estate Concession transactions. Based on these assurances, and because Duane Reade represented the majority of the Broker's business, the Principals agreed to participate in the Real Estate Concession transactions.

25.     At Cuti's suggestion, the Principals used two shell companies – "Shell A" and "Shell B" (collectively, the "Shell Companies") – to act as counterparties on the Real Estate Concession contracts with Duane Reade. From December 2000 through July 2004, Cuti designed and Tennant implemented at least thirteen sham Real Estate Concession transactions between Duane Reade and the Principals through their Shell Companies. The transactions were generally entered into at the end of the quarter, or entered into after the end of the quarter but backdated.

26.     Although the Real Estate Concession transactions with the Principals took various forms over the years, they all shared the following characteristics: (1) Cuti dictated the terms of each transaction; (2) none transferred anything of value to the Principals because Cuti prohibited the Principals from exercising any of the rights purportedly transferred without his pre-approval; and (3) none involved any transfer of value to Duane Reade because each was subject to a secret side agreement by which Cuti agreed to pre-fund, or repay the Principals for, the payments they made to Duane Reade.

27.     Despite their lack of any real economic substance, Cuti and Tennant structured the Real Estate Concession transactions with the Principals so that the payments would appear to be legitimate concession payments, and Cuti and Tennant convinced Duane Reade management and its auditors that the payments should therefore be recognized as current income. To

complete the fraud, and to minimize the effect of the repayments on current income, they disguised the repayments (paid to the Principals through the Shell Companies or the Broker) as compensation for brokerage services never rendered, or for amounts that were deliberately inflated. Disguising the repayments as payments for legitimate brokerage services allowed the company to capitalize and amortize those payments over the life of other, unrelated leases.

### (1) The Real Estate Concession Transactions Involving the 115 West 42nd Street Lease

28.   At Cuti's direction, Duane Reade and the Principals entered into two agreements concerning Duane Reade's lease at 115 West 42nd Street, one dated June 6, 2001 and the second dated December 21, 2002. These transactions were a sham for several reasons, including that Duane Reade was paid twice, first by Shell A, then later by Shell B, for terminating the same lease at 115 West 42nd Street, and that both payments to Duane Reade were reimbursed in later repayments by Duane Reade to the Principals.

29.   The June 2001 agreement called for Shell A to pay Duane Reade $690,000 on or before December 1, 2001, provided that Duane Reade committed prior to June 30, 2001 to terminate the lease at 115 West 42nd Street. However, the agreement did not include a date for Duane Reade to terminate the lease or vacate the premises. That is, the agreement did not require Duane Reade to perform; it only required that Duane Reade commit to perform at an unspecified future date. At Cuti's direction, Tennant structured, drafted and signed the June 2001 agreement on behalf of Duane Reade.

30.   Moreover, even if the June 2001 agreement had required Duane Reade actually to terminate the lease, such an agreement would only have required Duane Reade to give up a lease that it already expected to terminate. In the period leading up to the June 2001 agreement, the 115 West 42nd Street landlord had sued to evict Duane Reade because it planned to demolish the

building. On June 7, just one day after the June 6, 2001 agreement was executed, Duane Reade and the landlord finalized a settlement agreement pursuant to which Duane Reade agreed to terminate the lease and vacate on 120 days' notice from the landlord. Drafts of the settlement agreement had been prepared by at least May, and at the time Cuti and Tennant negotiated and Tennant signed the June 2001 agreement, they knew, or were reckless in not knowing, that Duane Reade would therefore terminate the lease, rendering its agreement with Shell A illusory.

31.     The Principals executed the June 2001 agreement and agreed to pay Duane Reade $690,000. But Shell A had no bona fide interest in paying Duane Reade to exit the location, and consistent with Principals' agreement with Cuti, Shell A took no action with respect to the property. However, based on the promise of payment from Shell A, Duane Reade was able to record current income on a property that Cuti, Tennant and the Principals knew Duane Reade would have to surrender in any event.

32.     Duane Reade recognized the $690,000 payment as income in the third quarter of 2001. This transaction alone caused Duane Reade to overstate pre-tax income by 7%, and boosted its reported earnings per share by $0.02, enabling it to meet Wall Street's analysts' expectations. As a result of this and other sham transactions, including the Credit and Rebilling transactions described below, Duane Reade's pre-tax income for the 2001 fiscal year was overstated by $5.2 million, or 14%.

33.     In a second agreement, dated December 21, 2002, the Principals again agreed to pay Duane Reade to exit the 115 West 42nd Street location, delivering an additional $650,000 in improper income to Duane Reade. The December 2002 agreement required Duane Reade to cease operations at the store by December 28, 2002, and required Shell B to pay Duane Reade $600,000 to assume the lease. Despite the transaction's lack of economic benefit to them, the

14

Principals agreed to the December 2002 agreement based on Cuti's assurances that they would be reimbursed in later transactions. The December 2002 agreement was signed by Cuti on behalf of Duane Reade. (The agreement was amended on March 14, 2003 to increase Shell B's payment obligation to $650,000.)

34. On the basis of the December 2002 agreement, Duane Reade recognized $600,000 of income in the fourth quarter of 2002 and another $50,000 in the first quarter of 2003, which resulted in an overstatement of the company's pre-tax income for the fourth quarter 2002 by 5%. This transaction, combined with the Credit and Rebilling scheme, inflated the company's pre-tax income for the quarter by $1.9 million, or 19%, and allowed Duane Reade to meet analysts' expectations.

### (2) The March 2003 Real Estate Concession Transaction – The Burned Out Store in the Bronx

35. On March 13, 2003, the Principals, on behalf of Shell A, and Cuti, on behalf of Duane Reade, entered into an agreement that purported to transfer Duane Reade's interest in four leaseholds to Shell A for $800,000. All of those interests were worthless. Under the agreement, Duane Reade was obligated to (a) discontinue operations at a location with a lease that was set to expire in less than three weeks; (b) assign a lease option, which Duane Reade was prohibited from assigning, on a property that was the subject of a condemnation proceeding; and (c) close two stores that it had already closed, one of which, located at 2914 Third Avenue in the Bronx, had been destroyed by fire, and as to which Duane Reade had already declared its lease "null and void." With full knowledge of all material facts, Tennant structured the March 2003 agreement, and Cuti negotiated and signed it, on behalf of Duane Reade.

36. The Principals executed the March 2003 agreement and paid Duane Reade $800,000, but only because Cuti compelled them to do so, and because they understood that Cuti

would make them whole through separate, subsequent repayments; the Principals had no bona fide interest in the properties that were the subject of the agreement. Both Defendants knew, or were reckless in not knowing, that the March 2003 agreement was a sham.

37.     In total, the income from the sham March 2003 agreement and other sham Real Estate Concession transactions in this period caused Duane Reade to overstate first quarter 2003 pre-tax income by $0.9 million, or 26%. When combined with the Credit and Rebilling scheme, pre-tax income was overstated by $1.3 million, or 36%, which inflated the company's first quarter earnings per share by $0.04.

### (3)     The June 2004 Real Estate Concession Transaction – The Jackson Heights Store

38.     On June 18, 2004, Duane Reade and Shell A entered into an agreement that purported to transfer Duane Reade's interest in a lease on a store located in Jackson Heights, Queens to Shell A for $1.1 million. This agreement was a sham for a number of reasons, including that the market value of the transaction was, at most, $300,000, and, pursuant to Cuti's secret side agreement with the Principals, all the payments to Duane Reade were to be reimbursed in subsequent fictitious transactions with the Principals.

39.     Sometime before June 18, the Broker approached the Jackson Heights landlord, on behalf of Duane Reade, to negotiate a lease surrender. The landlord offered to pay Duane Reade $300,000 to leave early, but the deal was never consummated. Shortly thereafter, at Cuti's direction, Shell A agreed to pay Duane Reade $1.1 million for the same lease. Thus, when Shell A agreed to acquire the lease, the Principals and Cuti knew that Duane Reade's interest was worth no more than $300,000. Indeed, on July 9, 2004, approximately three weeks after it agreed to pay Duane Reade $1.1 million for the Jackson Heights lease, and with Cuti's consent, Shell A surrendered the lease to the landlord for $300,000.

40.     The Principals executed the June 2004 agreement and paid Duane Reade

$800,000 more than the lease termination was worth because Cuti compelled them to do so and

because they expected to be made whole.  Both Defendants knew or were reckless in not

knowing that the payment would be returned and that the right they were transferring was, in any

event, worth no more than $300,000.  But they structured the June 2004 agreement to disguise its

nature and true value and to justify recording an additional $800,000 of improper current income

on Duane Reade's financial statements.

41.     As a result of this and other sham Real Estate Concession transactions in the same

period, the company's pre-tax income for the second quarter of 2004 was overstated by

$734,000, or 17%.

### (4)     The Love's Options – Sham Income Generating and Funding Transactions

42.     On two occasions, Cuti and Tennant arranged sham transactions related to Duane

Reade's option to purchase several stores controlled by Love's, a rival drug store chain.  The first

transaction generated current income and the second partially funded the Principals' payment on

an earlier income-generating sham transaction, in accordance with Cuti's secret side agreement

to make the Principals whole for the Real Estate Concession payments.

### (a)     The Real Estate Concession Transaction

43.     Cuti, on behalf of Duane Reade, and Shell A entered into an agreement, dated

December 24, 2000, under which Shell A paid Duane Reade $890,000 for a one-year option on

Duane Reade's options to acquire three locations from Love's, a small chain of drug stores

located in Manhattan.  Under the December 2000 option agreement, Shell A could exercise

Duane Reade's option for a period of one year, from December 24, 2000 to December 24, 2001.

Abiding by Cuti's directive that they not exercise any of the rights transferred to them under the

17

Real Estate Concession agreements, the Principals never sought to exercise Shell A's option or otherwise generate income from its $890,000 investment.

44.　　Duane Reade recognized the entire $890,000 received from Shell A in the fourth quarter of 2000. As a result of this and another sham Real Estate Concession transaction with Shell A during the same period, fourth quarter 2000 pre-tax income was overstated by $1.7 million, or 12%. When combined with Credit and Rebilling scheme transactions, these Real Estate Concession transactions resulted in the overstatement of fourth quarter pre-tax income by $2 million, or 15%, which enabled the company to meet analysts' expectations.

### (b)　　**The Funding Transaction**

45.　　In June 2004, to fund Shell A's $1.1 million payment in connection with the June 2004 agreement on the Jackson Heights store lease, discussed above at Paragraphs 38 through 41, Cuti caused Duane Reade to pay Shell A $870,000 to "cancel" the Love's option that had expired in 2001. That payment, along with the $300,000 payment Shell A had already received from the Jackson Heights landlord, gave Shell A all of the funds it needed to pay Duane Reade under the June 2004 Jackson Heights agreement. Duane Reade capitalized the option cancellation payment as a store acquisition cost, allowing it to capitalize and amortize the expense over time, but it recorded as current period income the $1.1 million payment by Shell A on the Jackson Heights store lease.

### (5)　　**Other Repayment Transactions Pursuant to the Secret Side Agreement**

46.　　As discussed above, Cuti's arrangement with Principals included a secret side agreement to repay them for the amounts Duane Reade received in the Real Estate Concession transactions, or in some cases, to pre-fund those transactions. Many of the repayments were funneled through the Shell Companies, which received payments from Duane Reade for

fictitious services or services for which they had no expectation of payment, or in amounts that were purposely inflated. Cuti also satisfied the repayment obligations by causing Duane Reade to pay the Broker real estate commissions to which it was not entitled. The Principals, Cuti and Tennant all understood that these unearned payments were intended to fund or pay back the Shell Companies' Real Estate Concession payments to Duane Reade.

47.     Cuti and Tennant completely controlled the nature and timing of the repayments. They not only approved the repayments, they dictated the structure of the payback transactions, including the amounts of the payments, and the properties to which the invoiced services purportedly related. Indeed, in some instances the invoices were fabricated and submitted for payment without any involvement by the Principals.

48.     For example, in November and December 2004, Shell B was paid on eight wholly fabricated invoices: the invoices appeared to be on Shell B letterhead but were not created or submitted by Shell B. The fabricated invoices were addressed to either Cuti or Tennant, and each was initialed by one of them, indicating his authorization to pay the invoice. Five of the fabricated invoices, totaling $520,000, were paid in November 2004. Shell B was paid an additional $255,750 on three other fabricated invoices, dated December 9, 2004.

49.     In other instances, one of the Principals prepared and submitted false invoices to Duane Reade for payment, but did so according to Cuti's or Tennant's specifications. On at least two occasions, Cuti called one of the Principals and directed him to invoice Duane Reade for phantom services, which Cuti specified. The Principal complied, and in September 2002, he submitted two invoices for a total of $790,000: one dated September 6, 2002, for $260,000 and purportedly related to Duane Reade's acquisition of a lease for a store located in Irvington, New Jersey; and a second, dated September 10, 2002, for $530,000, for "services rendered" in

connection with Duane Reade's acquisition of a lease in Long Island City, Queens. Both invoices were false, and the resulting $790,000 payment was in reality a means to repay the Shell Companies for their payments on the Real Estate Concession transactions, or "Cuti deals."

50.    While Cuti was the architect of the repayments, Tennant also played a key role. Tennant was in frequent contact with the Principals about their requests for repayment and how to paper the repayment transactions. Because the amounts Duane Reade owed the Principals often exceeded the amount that they could reasonably invoice to Duane Reade in connection with one transaction without raising red flags, Tennant instructed the Principals to submit false invoices concerning several properties. To deflect attention from the payback transactions, Tennant told the Principals to spread the full amount owed over several invoices, and also told them which properties to cite in each invoice.

51.    When the bogus repayments were made to the Broker, rather than the Shell Companies, Cuti typically directed Tennant to find a recent real estate transaction in which no broker, or a real estate broker other than the Broker, received a commission, and to pay the Broker a commission it had not earned in connection with that transaction. Tennant would identify a suitable transaction, and cause Duane Reade to pay the bogus commission to the Broker.

52.    According to the Restatement, Cuti and Tennant made the Principals completely whole through these bogus repayments – the Shell Companies paid Duane Reade a total of approximately $9 million in the Real Estate Concession scheme, and Duane Reade repaid the Principals approximately the same amount through the improper payments to the Shell Companies and the Broker.

**B.**    **Cuti's and Tennant's Lies to Other Senior Executives and the
Company's Auditors About the Real Estate Concession Transactions**

53.    To carry out and conceal their fraud, Cuti and Tennant lied about the Real Estate

Concession transactions to Duane Reade's CFO, other senior Duane Reade executives, and the

company's independent auditors.

54.    For example, with respect to several transactions with the Principals, Cuti assured

Duane Reade management and the auditors that the Real Estate Concession agreements with the

Shell Companies had been negotiated at arm's length and involved real transfers of valuable

rights.  Cuti knew these representations were false when he made them.  He also failed to

disclose the existence of the secret side agreement with the Principals that entitled them to

repayment and obligated them to forego exercising any of the rights supposedly transferred to

them.

55.    Cuti also signed management representation letters to the auditors in connection

with annual audits and quarterly reviews that made affirmative misrepresentations about the

terms of the transactions.  In the management representation letters that he signed and provided

to the auditors in connection with the 2001 through 2004 audits, as well as the 2003 and 2004

quarterly reviews, Cuti represented:

> The Company occasionally receives monies from real estate brokers, landlords,
> etc. related to the early termination of leases or the sale of various rights that the
> company has under existing lease agreements.  All agreements related to these
> transactions have been disclosed and made available to you.  There are no "side
> agreements" or other arrangements that obligate the Company in any way to the
> other party to these transactions.

These representations were false because most of the Real Estate Concession agreements

involved secret side agreements for repayment.

56.     Tennant also misled Duane Reade's CFO, other officers, and the company's auditors. Tennant knew that the purpose of the Real Estate Concession transactions was to improperly boost income and enable Duane Reade to meet earnings targets, and that all of them were fraudulent. Yet, on numerous occasions, he assured the company's CFO that the Real Estate Concession transactions were bona fide, arms' length transactions, and that all of them qualified for current period income recognition when he knew or was reckless in not knowing that the agreements either lacked economic substance or that the income should have been amortized, not recognized in the current period. Moreover, when Tennant drafted the bogus agreements with the Principals – which he later presented to the CFO as documentation of bona fide transactions – he structured them to evade the accounting rules and to justify up-front income recognition even though he knew that the payments should be amortized, or not recognized as revenue at all.

57.     Tennant not only knew or recklessly disregarded the truth about the Real Estate Concession transactions, he knew, or was reckless in not knowing, that his false assurances about them would be passed on to the company's auditors. Tennant knew that the CFO brought the Real Estate Concession transactions to the auditors' attention. Because Tennant was the company's former CFO, as well as a former public accountant, and because he was responsible for Duane Reade's real estate transactions, he knew or was reckless in not knowing that the CFO relied on his false assurances, and would repeat them to the company's auditors.

C.     **The Credit and Rebilling Scheme**

58.     Cuti's other earnings inflation scheme involved approximately $5.8 million in phony "credits" he obtained from construction and maintenance vendors. The "Vendor Credits" – most of which were recognized at the end of each fiscal year's fourth quarter between 2000 and 2004 – decreased Duane Reade's expenses, and thus increased its reportable income. To induce the vendors to go along with his scheme, Cuti entered into secret side agreements with them to repay the credited amounts through fictitious invoices that the vendors would submit and Cuti would authorize for payment at a later date. Through the fictitious invoices, the Vendor Credits were reversed and capitalized, making the Credit and Rebilling transactions one more kind of round-trip fraudulent transaction engineered by Cuti to inflate income.

59.     The Credit and Rebilling scheme fraudulently impacted Duane Reade's financial statements in two ways. The Vendor Credits caused an improper boost to current income in the quarter in which they were received or accrued, and the secret repayments artificially inflated the stated value of Duane Reade's assets on its balance sheet. Because Cuti directed the vendors to style their invoices for the repayments of the Vendor Credits as bills for services performed with respect to certain leaseholds and properties, the repayments were capitalized. When capitalized, costs incurred on a particular property interest are included under GAAP in the stated value of the asset. Therefore, the scheme also caused Duane Reade to overstate the value of its fixed assets – property and equipment – on its balance sheet by amounts equal to the repayments for the Vendor Credits.

60.     Beginning in the fourth quarter of 2000 and continuing through 2004, Cuti directed the Duane Reade employee responsible for the company's maintenance and construction

projects (the "Construction Project Employee") to demand "credits" from certain Duane Reade construction and maintenance vendors against the cost of a construction or maintenance project.

61.     Cuti explained the scheme to the Construction Project Employee and gave him explicit instructions on how to structure the round trips. To induce the vendors to comply with the scheme, Cuti told the Construction Project Employee to assure the vendors that Duane Reade would reimburse them for the Vendor Credits in later periods. And to disguise the nature of the repayments, Cuti instructed the Construction Project Employee to have the vendors bill for the repayments as payment for services rendered on projects other than those on which they had issued the Vendor Credits, and to describe the work billed so that the cost could be capitalized. Cuti gave the Construction Project Employee the precise language the vendors should use so that the payments would qualify as capital expenditures.

62.     Once he had initiated the scheme, Cuti regularly called the Construction Project Employee at or near the end of a quarter, and told him that the company was falling short of earnings targets for the quarter. He instructed the Construction Project Employee to obtain Vendor Credits to make up the shortfall. In most quarters, Cuti sought in excess of $400,000 in credits. The Construction Project Employee was careful not to discuss the Credit and Rebilling arrangement with anyone other than Cuti, because he knew that Cuti wanted it kept quiet.

63.     With the understanding that the Vendor Credits would be repaid, the vendors approached by the Construction Project Employee – all small, independently-owned, private companies – agreed to provide the Vendor Credits as an accommodation to a major client. For example, on December 30, 2002, a vendor Duane Reade regularly used to install and maintain store signs submitted a "credit memo" in the amount of $141,652. The credit memo described the credited amount as a "volume rebate allowance" for repairs to Duane Reade signs. To

24

reverse the credits and obtain his repayment, on February 14, 2003, the sign vendor submitted

nine separate bills to Duane Reade in various amounts, but which together added up to $141,652.

As instructed by the Construction Project Employee (who took his direction from Cuti), the sign

vendor described the work performed as "additional signage" at each of the nine locations, so

that the costs could be capitalized on Duane Reade's books.

64.     In another example, an architect Duane Reade regularly used for store build-outs

and related services provided Duane Reade with a $22,896 "credit" on March 31, 2003.  On May

13, 2003, in accordance with Cuti's instructions to the Construction Project Employee, the

architect billed Duane Reade for new work he purportedly performed in relation to different

stores, and submitted an invoice for exactly $22,896, the amount of the Vendor Credit he had

issued less than two months before.

65.     Several of the vendors who participated in the Credit and Rebilling scheme

maintained their own accounting of the round trips, and provided the accounting to the

Construction Project Employee to substantiate repayment.  For example, a construction

contractor Duane Reade regularly used to build new stores routinely provided the Construction

Project Employee with a detailed accounting of the total amount provided to Duane Reade in

Vendor Credits, the amount rebilled or owed, and to which stores the Vendor Credits and rebills

related.

66.     The Construction Project Employee knew that the rebilling invoices were phony

and that the Credit and Rebilling arrangement was a sham, but in accordance with Cuti's

direction, he submitted the construction contractor's rebill invoices for payment to Duane Reade,

thus completing the round trip.

67.     In total, from the fourth quarter of 2000 through 2004, approximately twelve vendors supplied Duane Reade with well over a hundred Vendor Credits in amounts ranging from several thousand dollars to several hundred thousand dollars.  The Vendor Credits significantly contributed to Duane Reade's reported income in some periods.  The greatest number of Vendor Credits was obtained in 2002, when they accounted for $2.7 million of the company's pre-tax income, or 6%.  And in the fourth quarter of 2002, Duane Reade overstated pre-tax income by $1.3 million, or 14%, by falsely booking the Vendor Credits as legitimate reductions to expenses.  In total, for the fiscal years 2000 through 2004, Duane Reade overstated pre-tax income by $4.3 million as a result of the Vendor Credits.  And because of the way that Cuti directed the reversal of the Vendor Credits, Duane Reade's assets were also overstated on its balance sheet by $4.3 million throughout the relevant period.

**D.     Cuti's Lies to Other Senior Executives and the Company's Auditors About the Credit and Rebilling Transactions**

68.     Cuti lied to Duane Reade's CFO about the Vendor Credits.  Cuti told the CFO that the vendors issued the Vendor Credits in legitimate, arm's length transactions, and that the Vendor Credits represented volume discounts or other legitimate reductions, when he knew that they did not.  Nor did he disclose to the CFO that he had committed Duane Reade to repay the vendors, or that, at his instruction, the vendors submitted false invoices to Duane Reade to reverse the credits.  As a result of his misrepresentations and omissions, Cuti hid the fact that the Vendor Credits had no economic substance and transferred nothing of value to Duane Reade.

69.     Cuti also lied to the auditors in management representation letters in which he made affirmative misrepresentations about his knowledge of the fraudulent, round-trip nature of the Credit and Rebilling scheme.  The management representation letters he signed assured the auditors that Cuti had "no knowledge of any fraud or suspected fraud affecting the company

involving [m]anagement, [or] employees who have significant roles over financial reporting. . .

." These representations – which are also applicable to the Real Estate Concession transactions –

were false because the CEO of Duane Reade, Cuti, knowingly directed the fraudulent Credit and

Rebilling round-trip transactions.

70.    The management representation letters Cuti signed also falsely assured the

auditors that Duane Reade's consolidated financial statements were prepared in conformity with

GAAP, and that all liabilities were included in the company's consolidated financial statements.

These representations – which are also applicable to the Real Estate Concession transactions –

were false because the company's financial statements failed to disclose that Cuti had committed

Duane Reade to repay the vendors for the Vendor Credits issued to Duane Reade during the

period.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act by Both Defendants**

71.    The Commission realleges and incorporates by reference Paragraphs 1 through

70, above.

72.    By engaging in the conduct described above, Defendants directly or indirectly, in

the offer or sale of securities, by the use of the means or instruments of transportation or

communication in interstate commerce or by use of the mails: (a) with scienter, employed

devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue

statements of a material fact or omissions to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading;

and (c) engaged in transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon purchasers of securities.  Cuti knowingly designed and

orchestrated each of the Real Estate Concession transactions and Credit and Rebilling

27

transactions knowing, or recklessly disregarding, that the transactions would result in material misstatements in Duane Reade's 2000-2004 public filings, each of which he signed. By preparing, and in some cases, signing the agreements related to the Real Estate Concession transactions, Tennant implemented them, with knowledge of or reckless disregard for their fraudulent nature, purpose and effect on Duane Reade's public filings during the 2000-2004 period, one of which he signed.

73.     By reason of the foregoing, Defendants have violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**SECOND CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder by Both Defendants**

74.     The Commission realleges and incorporates by reference Paragraphs 1 through 70, above.

75.     By engaging in the conduct described above, Defendants, with scienter, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, or of facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities. Cuti knowingly designed and orchestrated each of the Real Estate Concession transactions and Credit and Rebilling transactions knowing, or recklessly disregarding, that the transactions would result in material misstatements to Duane Reade's 2000-2004 public filings, each of which he signed. By

preparing, and in some cases, signing the agreements related to the Real Estate Concession

transactions, Tennant implemented them, with knowledge of or reckless disregard for their

fraudulent nature, purpose and effect on Duane Reade's public filings during the 2000-2004

periods, one of which he signed.

76.     By reason of the foregoing, Defendants have violated, and unless restrained and

enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and

Rule 10b-5, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF
### Aiding and Abetting Duane Reade's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder by Tennant

77.     The Commission realleges and incorporates by reference Paragraphs 1 through

70, above.

78.     By engaging in the conduct described above, Duane Reade directly or indirectly,

in connection with the purchase or sale of securities, by the use of means or instrumentalities of

interstate commerce or of the mails, or of facilities of a national securities exchange: (a)

employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact

or omitted to state a material fact necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading; and (c) engaged in acts,

practices, or courses of business which operated or would operate as a fraud or deceit upon other

persons, including purchasers and sellers of securities.  As a result of the fraudulent Real Estate

Concession transactions and the Credit and Rebilling transactions, Duane Reade materially

misstated its income in numerous public filings throughout the 2000-2004 period.

79.     By preparing, and in some cases, signing the agreements related to the Real Estate

Concession transactions, with knowledge that they would be used by Duane Reade to record

current income improperly, Tennant provided knowing and substantial assistance to Duane

Reade in materially misstating its public filings, one of which he signed.

80.     By reason of the foregoing, Tennant has aided and abetted Duane Reade's

violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. §

240.10b-5.

### FOURTH CLAIM FOR RELIEF
#### Violations of Section 13(b)(5) of the Exchange Act and
#### Rule 13b2-1 Thereunder by Both Defendants

81.     The Commission realleges and incorporates by reference Paragraphs 1 through

70, above.

82.     By engaging in the conduct described above, Defendants knowingly falsified

books, records, or accounts of Duane Reade, or knowingly circumvented or failed to implement

a system of internal accounting controls.

83.     By engaging in the conduct described above, Defendants directly or indirectly,

falsified or caused to be falsified, books, records, or accounts subject to 15 U.S.C. §

78m(b)(2)(A).

84.     By reason of the foregoing, Defendants have violated, and unless restrained and

enjoined will continue to violate, Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5),

and Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

### FIFTH CLAIM FOR RELIEF
#### Violations of Exchange Act Rule 13b2-2 by Both Defendants

85.     The Commission realleges and incorporates by reference Paragraphs 1 through

70, above.

86.     By engaging in the conduct described above, Defendants directly or indirectly, in

connection with (a) an audit, review, or examination of the financial statements of the issuer

required to be made pursuant to Commission rules, or (b) the preparation or filing of any document or report required to be filed with the Commission pursuant to Commission rules: (1) made or caused to be made a materially false or misleading statement to an accountant, or (2) omitted to state, or caused another person to omit to state, a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading to an accountant.

87.     Defendants, by engaging in the conduct described above, directly or indirectly took actions to mislead or fraudulently influence independent public or certified public accountants engaged in the performance of an audit or review of the financial statements of Duane Reade, while they each knew or should have known that their actions, if successful, could result in rendering Duane Reade's financial statements materially misleading.

88.     By reason of the foregoing, Defendants have violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2.

## SIXTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Sections 13(a) and 15(d) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, 15d-1, 15d-11, and 15d-13 Thereunder by Both Defendants**

89.     The Commission realleges and incorporates by reference Paragraphs 1 through 70, above.

90.     Based on the conduct alleged above, Duane Reade violated Sections 13(a) and 15(d) of the Exchange Act, 15 U.S.C. §§ 78m(a) and 78o(d), and Rules 12b-20, 13a-1, 13a-11, 13a-13, 15d-1, 15d-11, and 15d-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, 240.15d-1, 240.15d-11, and 240.15d-13, which obligate issuers of securities registered pursuant to the Exchange Act to file with the Commission annual and quarterly reports that, among other things, do not contain untrue statements of material fact or omit to state material

information necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

91.    By engaging in the conduct described above, Defendants knowingly provided substantial assistance to Duane Reade's filing of materially false and misleading reports and filings with the Commission.

92.    By reason of the foregoing, Defendants have aided and abetted Duane Reade's violations of Sections 13(a) and 15(d) of the Exchange Act, 15 U.S.C. §§ 78m(a) and 78o(d), and Rules 12b-20, 13a-1, 13a-11, 13a-13, 15d-1, 15d-11, and 15d-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, 240.15d-1, 240.15d-11, and 240.15d-13.

**SEVENTH CLAIM FOR RELIEF**
**Violations of Rule 13a-14 and 15d-14 under the Exchange Act by Cuti**

93.    The Commission realleges and incorporates by reference Paragraphs 1 through 70, above.

94.    As Duane Reade's principal executive officer, Cuti signed false certifications pursuant to Rules 13a-14 of the Exchange Act that were included in Duane Reade's 2002 and 2003 annual reports filed on Forms 10-K, as well as its quarterly reports filed on Forms 10-Q for the quarters ended September 28, 2002 through June 26, 2004.

95.    As Duane Reade's principal executive officer, Cuti signed false certifications pursuant to Rules 15d-14 of the Exchange Act that were included in Duane Reade's 2004 annual report filed on Form 10-K, as well as its quarterly reports filed on Form 10-Q for the quarters ended March 26, 2005 through September 24, 2005.

96.    In each such certification, Cuti falsely stated, among other things, that:  (a) each report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading; (b) each financial statement, and other financial information included in each report, fairly presented in all material respects the financial condition, results of operations, and cash flows of Duane Reade as of, and for, the period presented in the report; and (c) he had disclosed to Duane Reade's auditors all significant deficiencies in the design or operation of Duane Reade's internal controls and any fraud, whether or not material, that involved management or other employees who had a significant role in Duane Reade's internal controls.

97.     By reason of the foregoing, Cuti violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13a-14 and 15d-14, 17 C.F.R. §§ 240.13a-14 and 240.15d-14.

**EIGHTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 13(b)(2)(A) of the**
**Exchange Act by Both Defendants**

98.     The Commission realleges and incorporates by reference Paragraphs 1 through 70, above.

99.     Based on the conduct alleged above, Duane Reade violated Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

100.     By engaging in the conduct described above, Defendants knowingly provided substantial assistance to Duane Reade's failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of Duane Reade.

101.    By reason of the foregoing, Defendants have aided and abetted Duane Reade's violations of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

## NINTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 13(b)(2)(B) of the Exchange Act by Cuti

102.    The Commission realleges and incorporates by reference Paragraphs 1 through 70, above.

103.    Based on the conduct alleged above, Duane Reade violated Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B), which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, to devise and maintain a sufficient system of internal accounting controls.

104.    Cuti deliberately orchestrated the sham Real Estate Concession and Credit and Rebilling transactions as a means to improperly boost income by evading the Duane Reade's internal controls, thereby distorting the company's financial reports.  By engaging in this conduct and that described above, Cuti knowingly provided substantial assistance to Duane Reade's failure to devise and maintain a sufficient system of internal accounting controls.

105.    By reason of the foregoing, Cuti aided and abetted Duane Reade's violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B).

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant a Final Judgment:

## I.

Permanently enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the

injunction by personal service or otherwise, and each of them, from committing future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and from committing future violations of Sections 10(b) and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78m(b)(5), and Rules 10b-5, 13b2-1, and 13b2-2, 17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2, and from aiding and abetting future violations of Sections 13(a), 13(b)(2)(A), and 15(d) of the Exchange Act, 15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78o(d), and Rules 12b-20, 13a-1, 13a-11, 13a-13, 15d-1, 15d-11, and 15d-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, 240.15d-1, 240.15d-11, and 240.15d-13.

## II.

Permanently enjoining Cuti, his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Rules 13a-14 and 15d-14 of the Exchange Act, 17 C.F.R. §§ 240.13a-14 and 240.15d-14, and from aiding and abetting future violations of Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B).

## III.

Ordering each Defendant to disgorge any ill-gotten gains from the conduct alleged herein and to pay prejudgment interest thereon.

## IV.

Ordering each Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. §§ 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3).

## V.

Permanently barring each Defendant, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), from serving as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act 15 U.S.C. § 78l or that is required to file reports pursuant to Section 15(d) of the Exchange Act 15 U.S.C. § 78o(d).

## VI.

Granting such other and further relief as to this Court seems just and proper.

Dated:   New York, New York
         October 9, 2008

By: _____
         ANDREW M. CALAMARI
         Associate Regional Director
         Attorney for Plaintiff
         SECURITIES AND EXCHANGE COMMISSION
         New York Regional Office
         3 World Financial Center
         New York, New York 10281-1022
         (212) 336-1023

**APPENDIX A**
**Summary of the Improper**
**Real Estate Concession Transactions ($000)**

| Date of Agreement | Amount | Affected Quarter(s) |
|---|---|---|
| December 24, 2000 | $890 | Q4 2000 |
| January 1,  2000 | $806 | Q4 2000 |
| | | |
| May 16, 2001 | $2,087 | Q2 2001 |
| June 6, 2001 | $690 | Q3 2001 |
| June 20, 2001 | $380 | 4Q 2001 |
| September 14, 2001 | $820 | Q1 2002 – Q4 2004 |
| August 29, 2001 | $920 | Q4 2001– Q3 2002 |
| December 20, 2001 | $400 | Q4 2001 |
| | | |
| September 4, 2002 | $1,126 | Q3 2002 |
| September 4, 2002 | $375 | Q3 2002 |
| December 21, 2002[1] | $600 | Q4 2002 |
| | | |
| March 10, 2003 | $350 | Q1 2003 |
| March 13, 2003 | $800 | Q1 2003 |
| March 14, 2003 | $50 | Q1 2003 |
| | | |
| June 18, 2004 | $1,100 | Q2 2004 |
| July 28, 2004 | $3,454 | Q4 2004 |
| **Total** | **$14,848** | |

---

[1]    The December 21, 2002 Agreement was amended on March 14, 2003 to increase the payment amount from $600,000 to $650,000; the amendment affected a subsequent period, and is listed separately in this summary.